[L.A. No. 30868. Nov. 20, 1978.]

JAMES H. YOUNGBLOOD et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF SAN DIEGO COUNTY,
Defendant and Respondent;
SANTA FE COMPANY et al., Real Parties in Interest and Respondents.

[L.A. No. 30869. Nov. 20, 1978.]

WALTER S. ZABLE et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF SAN DIEGO COUNTY,
Defendant and Respondent;
SANTA FE COMPANY et al., Real Parties in Interest and Respondents.

### COUNSEL

Jonathan C. Gibson, Russell J. Clark, Stanley W. Legro and Legro, Rentto, Pate & Tower for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, R. H. Connett, E. Clement Shute, Assistant Attorneys General, Roderick Walston, Mark I. Weinberger and William M. Chamberlain, Deputy Attorneys General, Brian L. Forbes and Gray, Cary, Ames & Frye as Amici Curiae on behalf of Plaintiffs and Appellants.

Donald L. Clark, County Counsel, and John McEvoy, Deputy County Counsel, for Defendant and Respondent.

Milch, Wolfsheimer & Wagner, James S. Milch, Higgs, Fletcher & Mack and Ferdinand T. Fletcher for Real Parties in Interest and Respondents.

Acret & Perrochet, James M. Baratta, Harry N. Zavos, William H. Kronberger, Jr., Ronald A. Zumbrun, Donald M. Pach, Thomas E. Hookano, Turner & Sullivan, James P. Corn, Gary G. Kreep, Ogle, Gallo & Merzon, James B. Merzon, Asaro & Keagy, Richard R. Freeland and Charles Campbell as Amici Curiae on behalf of Defendant and Respondent and Real Parties in Interest and Respondents.

### OPINION

**TOBRINER, J.**—These consolidated cases involve the Rancho Del Dios subdivision in West-central San Diego County. On December 10, 1974, the Board of Supervisors of San Diego County approved a tentative subdivision map providing for one-acre lots, a land use permitted by the then zoning and general plan. On December 31, however, the county amended its general plan to limit density for Rancho Del Dios to one dwelling unit for each two acres; thus when the county approved the final subdivision map on October 25, 1975, the subdivision did not conform to the existing general plan.

Plaintiffs, neighbors of the subdivision, filed two mandamus actions against the board of supervisors; both suits contend that the board acted illegally in approving the tentative and final maps and that it was under a mandatory duty to rezone the subdivision to conform to the new general plan. In *Youngblood* v. *Board of Supervisors* the trial court sustained a general demurrer without leave to amend to the application for writ, and entered judgment for defendants; this appeal followed. In *Zable* v. *Board of Supervisors* the court sustained a demurrer on the ground of another action pending and stayed further proceedings; the *Zable* plaintiffs appeal from that order.

While the appeal was pending before this court, the board of supervisors amended the zoning for Rancho Del Dios to conform to the general plan, thus mooting the principal issue of this appeal. The only remaining issue relates to the board's approval of the tentative and final subdivision maps. With respect to those issues, we hold that the board did not act unlawfully in approving the tentative map; once the developer complied with the conditions attached to that approval and submitted a final map corresponding to the tentative map, the board performed a ministerial duty in approving the final map. We therefore affirm the judgment of the superior court in *Youngblood* v. *Board of Supervisors*. Because plaintiffs in *Zable* v. *Board of Supervisors* have attempted to appeal only from a trial court order sustaining a demurrer—a nonappealable order—we dismiss the appeal in that action.

1. *Summary of issues and proceedings.*

The Rancho Del Dios subdivision lies in the Rancho Santa Fe region in the hills of west-central San Diego County. At all times relevant the land in question was zoned A-4(1), an agricultural zone which permits residences on one-acre lots. (See San Diego Co. Code, art. X, § 210.) In 1967 the county adopted the San Dieguito General Plan to govern land use in the portion of the county which includes Rancho Santa Fe. The San Dieguito General Plan provided for residential development in Rancho Santa Fe at a density of 0 to .75 dwelling units per acre until, as we shall point out, it was amended on December 31, 1974.

On June 26, 1974, real party in interest Santa Fe Company filed an application for a tentative subdivision map for Rancho Del Dios. The map divides the 217-acre parcel into 131 lots, many of which would be only 1 acre or slightly larger in size. Because the developer proposed to retain a 40-acre parcel and several smaller parcels in an undeveloped

state, the density of the subdivision would approximate .6 dwelling units per acre.

On October 11, 1974, the San Diego County Planning Commission (Planning Commission) approved the proposed tentative map, expressly finding that it conformed to the existing zoning and general plan. The Planning Commission recommended, however, that a number of conditions be imposed upon approval of a final subdivision map. Although one such condition was that the developer apply for a zoning change from A-4(1) to E-1 (one-acre residential), a zone the commission believed more suitable for a residential subdivision, the Planning Commission refused to require the zoning change as a condition to approval of a final map. On December 10, the board of supervisors approved the tentative map subject to the conditions proposed by the Planning Commission.

Beginning in 1972, however, the county had been conducting hearings with a view to amending the San Dieguito General Plan. These hearings culminated on December 31, 1974, with the adoption of a new San Dieguito Community Plan. The new plan classifies the Rancho Santa Fe region for "rural estate" use and specifies that "The Rural Estate category will allow one dwelling unit per two acre parcel." The plan notes that zoning must conform to the land use designations of the general plan; it lists as compatible with the rural-estate designation a variety of zones, including E-1(B) (two-acre residential) and, "under certain circumstances" A-4(1), the present zoning for Rancho Del Dios. The plan does not list E-1 (one-acre residential) as a zone compatible with rural-estate designation.

Fulfilling the condition attached to approval of the tentative map, Santa Fe Company requested a zoning change to E-1. The Planning Commission opposed that request as incompatible with the new general plan, and proposed a zoning change to E-1(B). On April 24, 1975, the board of supervisors unanimously denied Santa Fe Company's request and, by a two-to-two vote, failed to approve the Planning Commission's request.[1]

Recognizing its duty to conform zoning to the new general plan, the board of supervisors announced its intention to schedule "conformity hearings" to consider zoning changes for each region within the San Dieguito Community Plan. The conformity hearings for the Rancho

---

[1]Supervisor Lee Taylor, who owned an interest in property in Rancho Santa Fe, disqualified himself from voting on the zoning proposals.

Santa Fe region, originally scheduled for September of 1976, finally took place in June and July of 1978.

On September 11, 1975, in *Youngblood* v. *Board of Supervisors,* neighbors of the Rancho Del Dios subdivision filed suit against the board. Their petition asserts two forms of relief. The first, a proceeding for traditional mandamus (Code Civ. Proc., § 1085), seeks to mandate the board of supervisors to rezone Rancho Del Dios to conform to the general plan. The second, a proceeding for administrative mandamus (Code Civ. Proc., § 1094.5), asserts that the board abused its discretion in refusing to rezone the subdivision to E-1(B) and in approving the tentative subdivision map.

Plaintiffs did not request interim relief and Santa Fe Company completed the improvements required by the tentative map. On October 25, 1975, the board of supervisors approved the final subdivision map. Plaintiffs then requested leave of court to file a supplemental petition alleging that the board acted unlawfully in approving the final map. Without acting on that request the superior court, on November 18, 1975, sustained defendants' demurrer to the petition without leave to amend on the ground that mandamus does not lie because the acts of approving the maps and refusing to rezone are "legislative and discretionary." The trial court thereupon entered judgment for defendants; plaintiffs appealed from that judgment.

On March 17, 1976, four other neighbors of the Rancho Del Dios subdivision filed a second petition (*Zable* v. *Board of Supervisors*) against the county, seeking essentially the same forms of relief as the *Youngblood* petition and supplement. On June 25, 1976, the trial court sustained a demurrer to the *Zable* petition without leave to amend on the ground of another action pending (Code Civ. Proc., § 430.10, subd. (c)), but stayed entry of judgment pending a final decision in *Youngblood.* The *Zable* plaintiffs appealed from that order.

While *Youngblood* and *Zable* were before the Court of Appeal, Santa Fe Company transferred all the lots in the subdivision. Some lots were acquired by officers or corporations related to Santa Fe Company, but many were purchased by individuals seeking homesites. On July 29, 1977, however, the Court of Appeal issued an injunction. As clarified in its subsequent order of August 3, 1977, the writ permits construction pursuant to building and grading permits already issued, but restrains the county from granting additional building or grading permits. We granted

hearings in both *Youngblood* and *Zable,* consolidated the cases for oral argument and opinion, and continued the Court of Appeal's injunction in effect pending our resolution of these cases.

Finally, on August 23, 1978, the board of supervisors completed its conformity hearings and rezoned Rancho Del Dios to E-1(B), a zone which requires two-acre lots and thus conforms to the San Dieguito General plan. The ordinance became effective September 22, 1978.

Turning to the cases before us, we first observe that the appeal in *Zable* v. *Board of Supervisors* must be dismissed. ■ No appeal lies from an order sustaining a demurrer without leave to amend. (*Lavine* v. *Jessup* (1957) 48 Cal.2d 611, 614 [311 P.2d 8]; *Beazell* v. *Schrader* (1962) 205 Cal.App.2d 673, 674 [23 Cal.Rptr. 189].) ■ A stay order may be appealed only if founded upon the ground of inconvenient forum. (See Code Civ. Proc., § 904.1, subd. (c).) Although the *Zable* plaintiffs point to the court's minute order directing that the *Zable* action be consolidated with *Youngblood* for future consideration, that consolidation neither transforms the order of June 25, 1976, into an appealable order nor gives the *Zable* plaintiffs standing to appeal the judgment in *Youngblood.*

In *Youngblood* v. *Board of Supervisors,* plaintiffs' petition for mandate to compel the board to rezone Rancho Del Dios to conform to the general plan is now moot. Plaintiffs' contention that the board abused its discretion in approving the tentative and final subdivision maps for Rancho Del Dios remains to be resolved on this appeal.

2. ■ *The board of supervisors did not abuse its discretion in approving the tentative subdivision map for Rancho Del Dios.*

■ ■■■ Plaintiffs assert that the board abused its discretion when it approved the tentative subdivision map.[2] They first argue that the tentative map was not approved until April 1975, after the enactment of the new San Dieguito Community plan, and that such approval was ineffective because the tentative map conflicted with the new general plan. The record shows, however, that the board approved the tentative map on December 10, 1974, subject to certain conditions, among which was the condition that Santa Fe Company apply for E-1(B) zoning; on

[2]Approval of a tentative subdivision map is a quasi-judicial act subject to judicial review for abuse of discretion under Code of Civil Procedure section 1094.5. (See *Woodland Hills Residents Assn., Inc.* v. *City Council* (1975) 44 Cal.App.3d 825, 838 [118 Cal.Rptr. 856].)

April 24, 1975, the board determined that Santa Fe had fulfilled this condition.

 The Subdivision Map Act contemplates that the local agency, when it approves a tentative map, will normally attach conditions to that approval, such as the completion of planned subdivision improvements, and will approve the final map only after certifying that the subdivider has complied with those specified conditions. (See generally Longtin, Cal. Land Use Regulations (1977) ch. 10.) This statutory structure compels the conclusion that the approval of a tentative map subject to conditions is nonetheless an approval for the purpose of determining that map's consistency with the existing general plan. Since the board conditionally approved the tentative subdivision map on December 10, 1974, the features of that map must be measured against the general plan in effect on that date.

Plaintiffs further maintain, however, that the tentative map conflicted with the 1967 San Dieguito General Plan in effect until December 31, 1974. That plan did not specify a minimum lot size, but called for a density ranging from 0 to .75 dwelling units per acre. Because the tentative map proposed a subdivision with an overall density of .6 dwelling units per acre, the planning commission and the board of supervisors found that it conformed to the general plan.

Plaintiffs claim that the plan contemplated a "sliding scale" of development, with greater density near the coast and lesser densities in the hills where Rancho Del Dios is located. This is a fair description of the plan as a whole, since it provides generally for densities in excess of .75 dwelling units per acre near the coast. But no language in the plan suggests a "sliding scale" within the 0 to .75 classification, and in fact Rancho Del Dios lies nearer to the coast than most of the land within that classification. Consequently the tentative map, providing for development at a density of .6 dwelling units per acre, did not conflict with the general plan.

Plaintiffs argue also that the board abused its discretion in approving a tentative subdivision map for a residential subdivision in an A-4(1) zone. Although the A-4(1) zone permits one-acre housing, it also permits agricultural uses—the keeping of cattle, sheep, and pigs, the construction of barns, silos, produce stands, etc.—often thought inappropriate for a residential subdivision.

We believe, however, that under the circumstances of the present case no abuse of discretion appears. Both the 1967 and 1974 general plans envision the eventual residential development of Rancho Del Dios; during that process agricultural use would give way to residential use, and the existing A-4(1) zone would be replaced by residential zoning. The practical realities of the subdivision suggest that it is unlikely that pending such rezoning any of the lot purchasers would devote their property to agricultural uses noxious to a residential subdivision. ■ In short, since zone A-4(1) permitted one-acre residential use, and since the county contemplated subsequent replacement of that zone with a more suitable residential zone, the board acted within its discretion in approving the Rancho Del Dios subdivision with A-4(1) zoning.

Plaintiffs finally argue that the board abused its discretion when it approved a tentative map calling for sewage disposal by means of septic tanks. Aware of the sanitation risks of septic tanks, the board attached a condition that no building permit should issue for any lot unless the San Diego County Department of Public Health by percolation tests satisfied itself that the site had sufficient percolation capacity to warrant installation of septic tanks. The plaintiffs do not offer any reason why this condition is insufficient to eliminate the risk of sanitary hazards.[3]

3. ■ *The board of supervisors properly approved the final subdivision map for Rancho Del Dios.*

On October 25, 1975, when the board of supervisors approved the final subdivision map for Rancho Del Dios, the new San Dieguito Community Plan called for two-acre homesites in the area of the subdivision. ■ ■■■ Plaintiffs contend that the final subdivision map providing for lots of less than two acres conflicted with the general plan then in effect, and thus that the board's approval of that map violated Business and Professions Code sections 11526 and 11549.5.[4] ■ The county and the developer in response maintain that under Business and Professions

---

[3]Plaintiffs argue that purchasers might be unaware of this condition, and that if their lots do not pass the test for approval of septic tanks, such purchasers might be unable to use their property. We do not know whether in fact any purchasers have bought lots without knowing of this condition or whether any lots have failed the percolation test; the speculative possibility that this might happen does not demonstrate that the board abused its discretion in approving the tentative map.

[4]The board's decision approving the final subdivision map is a ministerial act reviewable by ordinary mandamus pursuant to Code of Civil Procedure section 1085. (See *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403, 414 [107 Cal.Rptr. 359].)

Code sections 11549.6 and 11611 the county *was required* to approve a final map which conformed to a properly approved tentative map if the subdivider had complied with all conditions attached to the approval of the tentative map.[5] We shall explain why we agree with the county's construction of the governing statutes.

Prior to 1971, no statute required a subdivision map to conform to a general plan. With respect to approval of final maps, Business and Professions Code section 11610[6] provided generally that a final map conforming to the approved or conditionally approved tentative map may be filed with the legislative body for approval after all required certificates on such map have been signed and, where necessary, acknowledged. Section 11611 then specified that "The governing body shall at its next meeting or within a period of not more than 10 days after the filing approve the map if it conforms to all the requirements of this chapter and of any local ordinance applicable at the time of approval of the tentative map . . . ."[7] If the governing body fails to act within the time limit "the map, if it conforms to all the requirements above set forth, shall be deemed to be approved . . . ." (*Id.*)

The requirement that subdivision maps conform to a general plan was added by the enactment of Assembly Bill No. 1301 in 1971. (Stats. 1971, ch. 1446, § 4, p. 2853 and § 7, p. 2856.) When first passed by the Assembly, the bill contained two provisions requiring final maps to conform to a general plan. Section 11526, subdivision (c) stated that "No city or county shall approve a tentative or final subdivision map unless the governing body shall find that the proposed subdivision . . . is

---

[3]Santa Fe Company also argues that its subdivision is consistent with the new San Dieguito Community Plan because the subdivision provides a density of .6 dwelling units per acre which substantially complies with the .5 dwelling units per acre contemplated by the general plan. The general plan, however, does not speak in terms of density, but of lot size, and appears to require a minimum size of two acres. Because we conclude that the subdivision need only comply with the general plan in effect at the date of approval of the tentative map, we need not resolve whether it also complies with the new general plan.

[6]Statutes 1943, chapter 128, section 1, page 875. Business and Professions Code section 11610 was repealed effective March 1, 1975, and replaced by Government Code section 66457. The repealing legislation states that it "shall not apply to any map which was approved prior to March 1, 1975, nor . . . to any final map the tentative map of which was approved prior to March 1, 1975, and such maps shall be processed under the law which applied to the approved tentative map." (Stats. 1975, ch. 24, § 30, p. 43.) Since the tentative map for Rancho Del Dios was approved prior to March 1, 1975, that subdivision is governed by the Business and Professions Code provisions then in effect.

[7]Statutes 1965, chapter 1180, section 15, page 2987. Business and Professions Code section 11611 was repealed effective March 1, 1975, and replaced by Government Code section 66458, but the former statute governs subdivisions for which the tentative map was approved prior to March 1, 1975.

consistent with *applicable* general or specific plans of the city or county."[8] (Italics added.) Section 11549.5 then specifically listed all grounds which require the governing body to "deny approval of a final or tentative subdivision map"; the first ground listed, in subdivision (a), is "That the proposed map is not consistent with *applicable* general and specific plans."[9] (Italics added.) Since no statute specified which general plan is "applicable" when the governing body takes up the question of approval of a final map, sections 11526 and 11549.5 could have been construed either to require a final map to conform to the general plan in effect when that map came before the governing body for approval, as plaintiffs contend, or to require it only to conform to the general plan in effect when the tentative map was approved.

The state Senate, however, amended Assembly Bill No. 1301 to add an additional section which resolves this ambiguity. This new section, Business and Professions Code section 11549.6, provided that "A governing body shall not deny approval of a final subdivision map pursuant to Section 11549.5 if it has previously approved a tentative map for the proposed subdivision and if it finds that the final map is in substantial compliance with the previously approved tentative map."[10] The Assembly concurred in the Senate amendment and the bill as finally enacted included section 11549.6.

The purpose of section 11549.6, as we perceive it, was to confirm that the date when the tentative map comes before the governing body for approval is the crucial date when that body should decide whether to permit the proposed subdivision. Once the tentative map is approved, the developer often must expend substantial sums to comply with the conditions attached to that approval. These expenditures will result in the construction of improvements consistent with the proposed subdivision, but often inconsistent with alternative uses of the land. Consequently it is only fair to the developer and to the public interest to require the

[8]Statutes 1971, chapter 1446, section 3, page 2853. Business and Professions Code section 11526 was repealed effective March 1, 1975, and replaced by Government Code section 66473.5, but the former statute governs subdivisions for which the tentative map was approved prior to March 1, 1975.

[9]Statutes 1971, chapter 1446, section 7, page 2856. Business and Professions Code section 11549.5 was repealed effective March 1, 1975, and replaced by Government Code section 66474, but the former statute governs subdivisions for which the tentative map was approved prior to March 1, 1975.

[10]Statutes 1971, chapter 1446, section 7.5, page 2856. Business and Professions Code section 11549.6 was repealed effective March 1, 1975, and replaced by Government Code section 66474.1, but the former statute governs subdivisions for which the tentative map was approved prior to March 1, 1975.

governing body to render its discretionary decision whether and upon what conditions to approve the proposed subdivision when it acts on the tentative map. Approval of the final map thus becomes a ministerial act once the appropriate officials certify that it is in substantial compliance with the previously approved tentative map. (*Great Western Sav. & Loan Assn.* v. *City of Los Angeles, supra,* 31 Cal.App.3d 403, 411, 414; Longtin, Cal. Land Use Regulations, *op. cit. supra,* at p. 600.)

Plaintiffs, taking issue with our interpretation of section 11549.6, point out that although both sections 11526 and 11549.5 require the governing body to disapprove final maps which are not consistent with "applicable" general plans, section 11549.6 by its terms only limits the governing body's power under section 11549.5. Plaintiffs conclude that despite section 11549.6, the governing body under mandate of section 11526 must still disapprove a final map which does not conform to the general plan in effect when the final map is filed for approval.

The narrow construction of section 11549.6 proposed by plaintiffs, however, would render the enactment of that section a futile and useless act insofar as it purports to bear upon the power of the governing body to reject a final map which fails to conform to the general plan. Because section 11549.5 was the provision in Assembly Bill No. 1301 which specifically listed each finding which compels rejection of a map, legislative attention was drawn to this provision; the amendment adding section 11549.6, we believe, was intended not merely to qualify the language of section 11549.5, but also to qualify the duty of the governing body, described by section 11549.5, to reject a final map which does not conform to an "applicable" plan. We conclude that the language and import of the three sections—11526, 11549.5, and 11549.6—can be reconciled, and each section given full effect, only if we construed the term "applicable" general plan in sections 11526 and 11549.5 to mean the general plan in effect when the tentative map was approved.[11]

[11]Our construction of sections 11526 and 11549.5 finds further support in the provisions of Government Code section 66473, enacted effective March 1, 1975, but inapplicable to subdivisions for which the tentative map was approved prior to that date. When enacted, section 66473 provided that "A local agency shall disapprove a map for failure to meet or perform any of the requirements or conditions imposed by this division or local ordinance enacted pursuant thereto and, *in the case of a final map, applicable at the time of approval of the tentative map* . . . ." (Stats. 1974, ch. 1536, § 4, p. 3482.) (Italics added.) In 1976 the italicized provision was reworded to state that "a final map shall be disapproved only for failure to meet or perform requirements or conditions which were applicable to the subdivision at the time of approval of the tentative map. . . ." (Stats. 1976, ch. 21, § 1, p. 32.) Thus both the enactment of section 66473 in 1974 and its amendment in 1976 further demonstrate the Legislature's intention that a final map should not be disapproved for failure to comply with requirements, including general plans, inapplicable at the time of approval of the tentative map.

Plaintiffs do not contend that the final map for Rancho Del Dios does not substantially comply with the tentative map or that Santa Fe Company failed to fulfill the conditions attached to approval of the tentative map. Having held, as we stated earlier, that the board of supervisors properly approved the tentative map, we conclude that the board acted properly in approving the final map.[12]

### 3. *Conclusion*

In summary, we hold that the trial court correctly found that plaintiffs' petition in *Youngblood* v. *Board of Supervisors* stated no cause of action under Code of Civil Procedure section 1094.5 to nullify the board's approval of the tentative subdivision map. We conclude also that the court did not err in failing to permit plaintiffs in *Youngblood* to file a supplementary petition attacking the board's approval of the final map. Finally, plaintiffs' cause of action for mandate to compel the board to conform the zoning for Rancho Del Dios to the general plan is moot.

Accordingly, the judgment of the superior court in *Youngblood* v. *Board of Supervisors* is affirmed. Upon the finality of this opinion the injunction issued by the Court of Appeal in that action, and continued in effect by order of this court, is dissolved. The appeal in *Zable* v. *Board of Supervisors* is dismissed. Each party shall bear its own costs on appeal.[13]

Bird, C. J., Mosk, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

Appellants' petition for a rehearing in No. 30868 was denied January 3, 1979.

---

[12]Plaintiffs contend that the board's approval of the final map violated Government Code section 66474.5 (formerly Bus. & Prof. Code, § 11526.1) which provides that "No local agency shall approve a final subdivision map for any land project, as defined in section 11000.5 of the Business and Professions Code, unless . . . the local agency has adopted a specific plan covering the area proposed to be included within the land project. . . ." Plaintiffs did not present this contention to the trial court, and in fact if Rancho Del Dios is indeed a "land project" within the cited definition, it may have acquired that status only after these cases were pending on appeal. Because of the uncertainty of whether the subdivision is in truth a "land project," and because of the failure of the parties to present this issue to the trial court, we do not resolve it on the present appeal.

[13]Although defendants prevailed on the appeal, the board of supervisors' amendment of the zoning ordinance subsequent to briefing and argument of the appeal gave plaintiffs a portion of the relief they sought. Under such circumstances, it would be unfair to require plaintiffs to bear the entire cost of the appeal. (Cf. *Bell* v. *Board of Supervisors* (1976) 55 Cal.App.3d 629, 637 [127 Cal.Rptr. 757].)