[Civ. No. 65105. Second Dist., Div. Three. Aug. 22, 1985.]

BRIARWOOD PROPERTIES, LTD., et al., Plaintiff and Respondent, v. CITY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

Ira Reiner, City Attorney, Gary R. Netzer and Claudia McGee Henry, Assistant City Attorneys, Sharon L. Siedorf and Jolaine Harkless, Deputy City Attorneys, for Defendants and Appellants.

Boren, Elperin, Howard & Sloan, William Elperin, Tamila C. Jensen, Howard, Mund & Chizever, Alan M. Mund, Roger H. Howard, Gerald M. Chizever, Magasinn, Andelson, London, Berger & Zolla and Brooks London for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Defendants and appellants City of Los Angeles and Los Angeles City Council (Los Angeles) appeal from a judgment declaring Los Angeles Municipal Code section 47.06[1] invalid as applied to plaintiff and respondent Briarwood Properties, Ltd.'s (Briarwood) condominium conversion.

The trial court granted Briarwood's motion for a summary judgment based on its determination that section 47.06 was invalid as applied to Briarwood in that section 47.06 unlawfully imposed an additional condition after Briarwood had received tentative map approval in violation of the California Subdivision Map Act (Map Act), and that section 47.06 amounts to an unconstitutional impairment of Briarwood's vested right to proceed with its condominium conversion with only those conditions placed upon Briarwood at the time of tentative map approval.

For the reasons hereinafter discussed, we reverse the judgment.

FACTS AND PROCEDURAL HISTORY

In 1978, Los Angeles was concerned with the increased pace of condominium conversion within its borders and determined the existing subdivision regulations were not adequate to deal with the unique problems created thereby. Therefore, Los Angeles enacted a comprehensive new ordinance, section 12.5.2, dealing solely with condominium conversions.

Section 12.5.2 authorized an advisory agency to disapprove a tentative map for condominium conversion when the appartments were occupied more than 50 percent by persons with minor dependent children, and/or low to moderate income renters, and/or disabled or elderly tenants, and the

---

[1]Unless otherwise indicated, all section references are to the Los Angeles Municipal Code.

applicant had not developed a "reasonable relocation assistance plan."[2] It did not provide for a relocation assistance plan if the 50 percent tests were not met.

In December 1978, the tentative map for the conversion of Briarwood's apartments to condominiums received approval.[3]

In December 1979, to address further the problem caused by tenant displacement due to condominium conversions, Los Angeles adopted section 47.06 to provide additional help for relocation of tenants. Section 47.06 required relocation assistance up to $2,500 per unit for disadvantaged "qualified tenants," and made failure to provide relocation assistance an affirmative defense to a landlord's action to recover possession of a rental unit.[4]

---

[2] Section 12.5.2 provided in pertinent part: "6. The Advisory Agency may disapprove a Tentative Map or Preliminary Parcel Map for a condominium conversion project if it finds that at any time during the 18 months prior to Map application more than 50% of the dwelling units in the project were occupied by a person over the age of 62, a handicapped or disabled person as herein defined, and/or one or more minor dependent children, and the applicant has not developed a reasonable relocation assistance plan with respect to each such person. [¶] Any such relocation assistance plan shall contain, at a minimum: [¶] (a) A report to each tenant concerning the availability of housing in the area of the project comparable to the unit occupied by the tenant as to quality, price and amenities, and [¶] (b) A description of the reasonable steps the applicant will undertake to assure successful relocation of each tenant; and [¶] (c) An unconditional offer to pay each relocated tenant a relocation fee not to exceed $500. [¶] The Advisory Agency may disapprove any relocation assistance plan which does not satisfy the criteria herein. [¶] 7. No Tentative Map or Preliminary Parcel Map for a condominium conversion project shall be approved where the Advisory Agency finds that at any time during the 18 months prior to Map application more than 50% of the units in the project were low to moderate cost housing, unless it finds that there are exceptional circumstances consistent with the purposes of this Code justifying approval of the Map. . . . In any event, no such Map shall be approved unless a reasonable relocation assistance plan satisfying the criteria of paragraph 6 of this Subsection has been developed by the applicant."

Section 12.5.2 was later amended to require more extensive tenant relocation assistance as a condition of tentative tract map approval.

[3] The property was at that time owned by Camino Palmero Properties Ltd.; Briarwood purchased it in June 1979.

[4] Section 47.06 read in pertinent part: "A. Statement of Purposes. At the present time, there is a critically short supply of rental housing in the City of Los Angeles. Many rental housing units have been removed from the rental market through conversion to condominiums, . . . Tenants who are evicted due to conversion are experiencing serious difficulties in locating comparable replacement rental housing. These difficulties are particularly acute for elderly tenants and those with physical limitations, particularly the handicapped and disabled. In addition, families with minor dependent children face greater relocation difficulties than families without such children. [¶] The City's condominium conversion ordinance addresses these grave public health and welfare problems in the context of new conversions of existing rental units to various forms of divided ownership. However, that ordinance does not provide assistance to tenants displaced due to the conversion of their rental units to condominiums, . . . Additionally, in some instances tenants displaced due to conversions already approved by the City (under the previous conversion ordinance) are not receiving

In April 1980, Los Angeles amended section 47.06 to provide $2,500 relocation assistance for qualified tenants and $1,000 relocation assistance to all other tenants, even if tenants were offered monetary relocation assistance pursuant to an approval for a condominium conversion under section 12.5.2. Where tenants were receiving monetary payments under section

---

relocation assistance, yet often face similar relocation difficulties. [¶] Since the conversion of rental units to condominiums, . . . is a substantial cause of the rental housing shortage, the City Council finds and declares that it would be just and proper for the subdividers who may enjoy the benefits of such conversions to assist certain disadvantaged tenants who are displaced by the conversion activity and who otherwise would be forced to bear the burdens of displacement without any assistance. The Council also finds that the necessity for relocation assistance is significantly less for the tenants of luxury apartment units. [¶] In light of the critical shortage of rental housing in the City at the present time and the increasing number of apartments being removed from the rental market, the City Council finds and declares that remedial legislation is needed immediately. [¶] B. Definitions. For purposes of this Section, the definitions in Section 12.03 of this Code and the following definitions shall apply: [¶] . . . . [¶] Qualified Tenant: Any tenant who satisfies any of the following criteria on the date said tenant receives a Notice to Quit pursuant to Civil Code Section 1946; over age 62; handicapped . . .; disabled . . .; a person residing with and on whom is legally dependent . . . one or more minor children. . . . [¶] . . . . [¶] C. Evictions. A landlord may not bring and maintain an action to recover possession of a rental unit occupied by one or more qualified tenants in order to convert the building into a condominium, . . ., unless the landlord has provided relocation assistance in accordance with the following Subsection. [¶] D. Relocation Assistance. Relocation assistance, where required by the preceding Subsection, shall be provided in accordance with the following provisions. [¶] 1. Landlord's Responsibility. [¶] a. The landlord shall: [¶] (1) Make available to each qualified tenant, at no cost, a reasonably complete and current list of vacant and available rental units within a one and one half mile radius of the building being converted, which units are comparable as to size and amenities to the unit occupied by the tenant, and [¶] (2) Make a reasonable and good faith effort to assure that qualified tenants without cars are driven, at no cost, and qualified tenants with cars are assisted, in order to inspect replacement rental units, and [¶] (3) Hire an ambulance or similar vehicle, at no cost to the tenant, and otherwise take reasonable steps to assist any disabled or handicapped tenant with relocation related activities, and [¶] (4) Pay a relocation fee of $2500 to qualified tenants in order to assist such tenants in meeting costs of relocation, higher rents for replacement housing, and related expenses, which payment shall be made as follows. . . . [¶] b. In lieu of the assistance provided for in Paragraph a above, the landlord may elect to relocate any qualified tenant into a comparable replacement rental unit satisfactory to the tenant and pay all actual costs of relocating the tenant up to a maximum of $2500 per household. A tenant may not unreasonably withhold approval of a replacement rental unit offered by the landlord. . . . [¶] . . . . [¶] E. Affirmative Defense. In an action by a landlord to recover possession of a rental unit, a qualified tenant may raise as an affirmative defense the failure of the landlord to provide relocation assistance as required by this Section. [¶] F. . . . . [¶] Sec. 2. Urgency Clause. [¶] There are elderly, disabled and handicapped tenants and tenant families with minor children in the City of Los Angeles who face imminent eviction due to removal of their apartments from the rental housing market. In light of the critically low supply of affordable rental housing in the City, especially in those areas where conversion of rental units to condominiums, . . ., the City Council finds and declares that this ordinance is needed for the immediate preservation of the public health and safety and shall go into effect immediately upon publication."

A few days later, the Los Angeles City Council adopted the companion section 47.07 to provide relocation assistance of $2,500 for "qualified tenants" and $1,000 for all other tenants.

12.5.2, those amounts were to be credited against the amounts specified in section 47.06. The amended provision was to apply to all efforts to recover possession of a rental unit commenced on or after April 1, 1980.[5]

In June 1980, Briarwood filed a complaint seeking a declaration that the Los Angeles Municipal Code relocation assistance ordinances could not apply to Briarwood.

In April 1981, the trial court granted Briarwood's motion for summary judgment. The trial court ruled section 47.06 invalid as applied to Briarwood in that it imposed conditions on Briarwood's condominium conversion project after tentative map approval in violation of the Subdivision Map Act (Gov. Code, § 66410 et seq.). The trial court further held section 47.06 created an unconstitutional impairment of Briarwood's vested right to proceed with its condominium conversion project with only the conditions existing at the time of tentative map approval.

Appellate proceedings were stayed pending resolution by the California Supreme Court of two related cases. The Supreme Court has now decided *Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858 [201 Cal.Rptr. 593, 679 P.2d 27] and *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894]. This case is therefore reviewed in light of those decisions, because they are binding on this court.

---

[5]Section 47.06 as amended in April 1980 reads in pertinent part: "B. Definitions. For purposes of this Section, the definitions in Section 12.03 of this Code and the following definitions shall apply: [¶] . . . . [¶] Qualified Tenant: Any tenant who satisfies any of the following criteria on the date said tenant receives a Notice to Quit . . . ; over age 62; handicapped . . . ; disabled . . . ; a person residing with and on whom is legally dependent . . . one or more minor children. [¶] . . . . [¶] C. Evictions. A landlord may not bring and maintain an action to recover possession of a rental unit occupied by one or more tenants in order to convert the building into a condominium, . . . , unless [the landlord has provided] relocation assistance in accordance with the following subsection. This Subsection shall not apply where a subdivision map application for condominium, . . . purposes was filed for approval with the city prior to issuance of the original certificate of occupancy for the building. [¶] D. Relocation Assistance. Relocation assistance, where required by the preceding Subsection, shall be provided in accordance with the following provisions. [¶] 1. Landlord's Responsibility. [¶] a. The landlord shall: [¶] . . . . [¶] (4) Pay a relocation fee of $2500 to qualified tenants and a $1,000 fee to all other tenants in order to assist such tenants in meeting costs of relocation, higher rents for replacement housing, and related expenses, which payment shall be made as follows. . . . Where a tenant is entitled to monetary relocation benefits pursuant to city administrative agency action or any provision of local, state or federal law, such benefits shall operate as a credit against any fee required to be paid to the tenant under this Section. [¶] . . . . [¶] F. Applicability. [¶] 1. This Section, as enacted in Ordinance No. 153,251, shall apply to judicial proceedings to recover possession of a rental unit occupied by a qualified tenant commenced on or after December 15, 1979 and before April 1, 1980. [¶] 2. This Section, as amended herein, shall apply to judicial proceedings to recover possession of a rental unit occupied by a tenant commenced on or after April 1, 1980."

(*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

## CONTENTIONS

Los Angeles contends section 47.06 did not impose a new condition on the tentative map in violation of the Map Act, and that Briarwood did not have a vested right to continue the conversion free from application of section 47.06.

## DISCUSSION

### 1. *Standard of review.*

 It is basic that in reviewing lower court decisions, the function of the appellate court is to review questions of law, not questions of fact. (*Tupman* v. *Haberkern* (1929) 208 Cal. 256, 263 [280 P. 970]; *Menning* v. *Sourisseau* (1933) 128 Cal.App. 635, 638 [18 P.2d 77]; 6 Witkin, Cal. Procedure (2d Ed. 1971) Appeal, § 209, p. 4200.) An error of law is reversible if an examination of the entire record indicates that the error resulted in a miscarriage of justice. (*Tupman* v. *Haberkern, supra,* 208 Cal. at p. 263; Code Civ. Proc., § 475; Cal. Const., art. VI, § 13.)

There is no dispute that all matters challenged herein are questions of law, and therefore they are reviewed as such.

### 2. *Section 47.06 did not unlawfully impose a new condition.*

 At issue is whether approval of Briarwood's tentative map for the conversion of condominiums precludes application to Briarwood of the subsequently adopted section 47.06 tenant relocation assistance requirements.

Section 47.06 is a police power regulation providing that tenants of rental apartments being converted to condominiums be given relocation before being evicted.

In *Santa Monica Pines,* the court considered a similar argument to that advanced by Briarwood with respect to a provision of the Santa Monica rent control law. The Santa Monica law requires a developer to obtain a removal permit from the Santa Monica Rent Control Board before removing existing rental apartments from the market. Like Briarwood, the developer in *Santa Monica Pines* had received tentative map approval before the rent control law was enacted.

The *Santa Monica Pines* court explained that "[t]he ordinance's requirement of a removal permit is not a 'new condition' imposed on a subdivision in violation of *Youngblood;*[6] it is not a restriction on the right to subdivide at all. Nor did approval of the tentative subdivision map imply that removal of units from the rental market was also 'approved.' The map act is primarily concerned with land use planning issues; it governs condominium conversions only to the extent of ensuring tenants' rights to *purchase* their apartments. The act leaves other aspects of conversion regulation to the local police power." (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d at p. 866, fn. 6.)

Briarwood argues that because Los Angeles had a rent control ordinance providing for some tenant relocation assistance (§ 12.5.2) and had conditioned tentative map approval upon Briarwood's compliance with that ordinance, it could not subsequently impose upon Briarwood the more extensive relocation assistance requirements of section 47.06.

The law is otherwise. Briarwood is correct only in that after conditioning tentative map approval upon the requirement of compliance with section 12.5.2, Los Angeles could not subsequently deny *final map approval* based on the additional conditions of section 47.06. (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 37 Cal.3d at p. 866, fn. 6; *Youngblood* v. *Board of Supervisors, supra,* 22 Cal.3d 644; *El Patio* v. *Permanent Rent Control Bd., supra,* 110 Cal.App.3d 915; Gov. Code, §§ 66458, subd. (a), 66473, 66474.1.) Briarwood secured final map approval and proceeded with the conversion.

Section 47.06 simply requires Briarwood, along with all developers in Los Angeles involved in condominium conversion, to satisfy certain requirements pertaining to tenant relocation. (See *People* v. *H & H Properties* (1984) 154 Cal.App.3d 894, 899-900 [201 Cal.Rptr. 687].)

The trial court was incorrect as a matter of law in holding that application of section 47.06 to Briarwood unlawfully imposed conditions on Briarwood after tentative map approval.

3. *Section 47.06 does not infringe on Briarwood's vested rights.*

The trial court ruled section 47.06 was an unconstitutional impairment of Briarwood's vested right to proceed with its condominium project in ac-

---

[6]*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 655-656 [150 Cal.Rptr. 242, 586 P.2d 556], held a county could not deny a developer's final map on the basis of additional conditions imposed on an already approved tentative map, when the developer had satisfied the conditions initially placed on said map. (See also *El Patio* v. *Permanent Rent Control Bd.* (1980) 110 Cal.App.3d 915 [168 Cal.Rptr. 276].)

cordance with only those conditions placed upon Briarwood at the time of tentative map approval.

■ The rights that vest through reliance on a government permit are only those rights specifically granted by the permit itself. (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d at p. 866.) ■ Thus, if Briarwood obtained any vested rights based on tentative map approval, such rights related only to Briarwood's authority to convert the apartment building as provided in the tentative map. On this point, there is no dispute. Briarwood obtained final map approval, converted, and sold most of the condominium units.

Rather, Briarwood's claim of a vested right seems to be that "reliance expenditures" based on tentative map approval assured not only the right to complete the conversion, but also the right to be free of any subsequently adopted regulations—specifically, section 47.06's relocation requirements.

As the court stated in *Santa Monica Pines,* this "argument seems based on the erroneous notion that they have a 'vested right to obtain a vested right.'" (*Id.,* 35 Cal.3d at p. 865.) Thus, while Briarwood obtained a vested right to complete the conversion process, it did not obtain a vested right to do so free from application of the independent relocation assistance requirements of section 47.06, which in no way interfered with the conversion process.

■ Moreover, very recently we held in *Blue Chip Properties* v. *Permanent Rent Control Bd.* (1985) 170 Cal.App.3d 648 [216 Cal.Rptr. 492], that tentative map approval for condominium conversion does not lead to a vested right not to be bound by subsequent rent control laws. ■ Applying that holding here, similarly, tentative map approval for condominium conversion does not lead to a vested right to be free from valid subsequently enacted tenant relocation assistance laws.

*4. Section 47.06 is not preempted by Code of Civil Procedure sections 1159-1179a.*

■ Briarwood contends section 47.06 is preempted by Code of Civil Procedure sections 1159-1179a, even if valid as applied. Code of Civil Procedure sections 1159-1179a (unlawful detainer) provide landlords with summary proceedings for recovery of possession of rented property and of unpaid rent from tenants.

■ A local ordinance conflicts with the general law if there is either a direct conflict with a state statute, or the state has fully occupied the field

of legislation involved. (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851 [76 Cal.Rptr. 642, 452 P.2d 930].) None of the provisions of the unlawful detainer statutes prohibits or authorizes relocation assistance to tenants, nor the establishment of an affirmative defense to an unlawful detainer action.

Further, the purpose of the unlawful detainer law is procedural and provides for relatively simple and speedy summary repossession, thus obviating a resort to self-help by landlords. (*Kassan* v. *Stout* (1973) 9 Cal.3d 39, 43-44 [106 Cal.Rptr. 783, 507 P.2d 87].)

In *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], the California Supreme Court discussed whether a rent control statute's provisions relating to tenant eviction were preempted by state laws regarding tenant eviction. The court concluded that Code of Civil Procedure sections 1159-1179a do not preclude a defense based on municipal legislation enacted pursuant to police power. (*Id.*, at p. 149.) However, the court explained the *Berkeley* provision invalidly conflicted with Code of Civil Procedure sections 1159-1179a because, "[u]nlike the limitations imposed by the charter amendment . . ., *which can affect summary repossession proceedings only by making substantive defenses available to the tenant,* the requirement of a certificate of eviction raises procedural barriers between the landlord and the judicial proceeding. [Footnote omitted.]" (*Id.*, 17 Cal.3d at p. 151, italics added.)

Section 47.06 merely provides tenants with a substantive defense to an unlawful detainer action. It raises no procedural barriers between the landlord and the intended summary proceedings, and thus is not preempted by Code of Civil Procedure sections 1159-1179a.

*5. Section 47.06 is not an illegal special tax.*

Briarwood also claims the relocation assistance payments required by section 47.06 constitute "special taxes" in violation of article XIII A, section 4 of the California Constitution. While a "special tax" has not been expressly defined, cases discussing the term examine ordinances and statutes to determine if they have been treated as taxes in the past.

" '[S]pecial taxes' under article XIII A, section 4 of the California Constitution do not embrace fees for land-use regulatory activities where the fees charged to particular applicants do not exceed the reasonable cost of the regulatory activities and are not levied for unrelated revenue purposes." (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 663 [166 Cal.Rptr. 674].)

In *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 325, 328 [170 Cal.Rptr. 685], the court held the enaction of school facilities fees and in lieu dedication requirements to alleviate school overcrowding caused by development as a condition precedent to the development were not "special taxes" within the meaning of article XIII A, section 4 of the California Constitution. Rather, the ordinance was found to be a valid exercise of the city's police power, because the fee bore a reasonable relationship to the need generated by the development and was important to the general welfare of the community. (*Id.*, at pp. 327-328.)

■ It has been recently held that section 47.06 is a valid exercise of Los Angeles' police powers, reasonably related to the city's goal of cushioning the displacement effect of condominium conversion. (*Kalaydjian* v. *City of Los Angeles* (1983) 149 Cal.App.3d 690, 693-694 [197 Cal.Rptr. 149].) The *Kalaydjian* court indicated the imposition of relocation fees is within the power of the city and that, "[d]evelopers benefitting from zoning changes granted by the community may be required to pay for the adverse effects of those changed uses. Just as a subdivider may be required to dedicate land to alleviate an increase in traffic caused by the subdivision, the developer may be required to alleviate displacement and other adverse effects of a zoning conversion." (*Id.*, at p. 693.) The court also acknowledged the reasonableness of the means set out in section 47.06 to assist dislocated tenants and of the basis for determination of the fees. (*Id.*, at p. 694.)

The rationale of these cases supports a conclusion that section 47.06 is not a "special tax" in violation of article XIII A, section 4 of the California Constitution.

6. *Section 47.06 is not an unconstitutional impairment of contract.*

■ Finally, Briarwood avers that section 47.06 constitutes an invalid impairment of contract in violation of the United States and California Constitutions. This argument is premised on the theory that Briarwood entered into a contract with Los Angeles when it executed and recorded a covenant as required for tentative map approval, and agreed to perform certain obligations. However, Briarwood does not set forth the terms of any such purported contract.

Article I, section 10, clause I, of the United States Constitution and article I, section 9 of the California Constitution provide that no state shall pass any law impairing the obligation of contracts. It is fundamental that in order to impair a contract, there must be a contract, i.e., "an agreement of two or more minds, upon sufficient consideration to do or not to do certain

acts." (*Crane* v. *Hahlo* (1922) 258 U.S. 142, 146 [66 L.Ed. 514, 517, 42 S.Ct. 214].) Here, it is questionable that any contract ever came into existence and, without a contract, there could be no impairment.

### Disposition

Section 47.06 did not unlawfully impose additional conditions on Briarwood after tentative map approval nor unconstitutionally impair Briarwood's vested rights. The judgment is reversed and judgment is ordered entered in favor of Los Angeles.

Lui, J., and Danielson, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 20, 1985. Mosk, J., was of the opinion that the petition should be granted.