[Civ. No. 58653. Second Dist., Div. One. Oct. 6, 1980.]

EL PATIO et al., Petitioners, v.
PERMANENT RENT CONTROL BOARD OF THE CITY
OF SANTA MONICA et al., Respondents;
SANTA MONICA FAIR HOUSING ALLIANCE, Intervener.

COUNSEL

Boren, Elperin, Howard & Sloan, William Elperin, Roger H. Howard, Tamila C. Jensen and Ralph B. Dash for Petitioners.

Paul, Hastings, Janofsky & Walker, William B. Campbell and Alan K. Steinbrecher as Amici Curiae on behalf of Petitioners.

Richard L. Knickerbocker, City Attorney, Stephen S. Stark, Acting City Attorney, Evelyn Keller, Deputy City Attorney, Barry A. Fisher, David Grosz, David Pettit, Michael Heumann, Susan Carroll and Bettylou Borovay for Respondents.

Robert M. Meyers for Intervener.

OPINION

**HANSON (Thaxton), J.—**

### INTRODUCTION

In this original proceeding in mandate petitioners seek to set aside respondents' decision denying petitioners' request for a vested right determination as to a conversion of an apartment building to a condominium.

### CHRONOLOGY OF EVENTS

*On July 10, 1978,* the Planning Commission of the City of Santa Monica (hereinafter City) approved a tentative subdivision map for the condominium conversion of a 34-unit apartment building. The approval of the tentative subdivision was conditioned upon the execution of a certificate of compliance, the furnishing of additional parking spaces, the installation and maintenance of smoke detectors, and one other condition but none of the parties contend that any of the foregoing conditions

related to the need for a permit to remove the apartment from the rental market.

In October 1978 petitioners entered into an escrow to purchase the apartment building.[1] Shortly thereafter petitioners and the sellers entered into a management contract in which petitioners were authorized to refurbish common areas and vacant units.

*In March 1979* the California Department of Real Estate issued a preliminary subdivision report which petitioners had requested.

*On April 10, 1979*, the voters of the City passed a rent control charter amendment. That charter amendment establishes a Permanent Rent Control Board (hereinafter Board) and, in point here, gives the Board the power to issue permits for removal of controlled rental units from the rental housing market. (City of Santa Monica Charter, art. XVIII, § 1803, subd. (f)(10).)[2] The charter amendment also requires that a landlord obtain a permit from the Board prior to removal of the rental unit from the market and set forth the findings required by the Board. (City of Santa Monica Charter, art. XVIII, § 1803, subd. (t).)[3]

---

[1]Petitioners allege that both prior to April 10, 1979, and thereafter they incurred substantial expenses in regard to the refurbishing as well as other expenses related to the condominium conversion. Although the return disputes the substantial nature of these expenses, we need not resolve that factual dispute as our conclusion does not rest upon any consideration of substantial expenditures.

[2]Article XVIII, section 1803, subdivision (f)(10), of the Charter of the City of Santa Monica provides: "POWERS AND DUTIES: The Board shall have the following powers and duties:

"...

"(10) Issue permits for removal of controlled rental units from rental housing market under Section 1803(t)."

[3]Article XVIII, section 1803, subdivision (t), provides: "REMOVAL OF CONTROLLED RENTAL UNIT FROM RENTAL HOUSING MARKET: Any landlord who desires to remove a controlled rental unit from the rental housing market by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with rules and regulations promulgated by the Board. In order to approve such a permit, the Board is required to make each of the following findings:

"(1)    That the controlled rental unit is not occupied by a person or family of very low income, low income or moderate income.

"(2)    That the rent of the controlled rental unit is not at a level affordable by a person or family of very low income, low income, or moderate income.

"(3)    That the removal of the controlled rental unit will not adversely affect the supply of housing in the City of Santa Monica.

"(4)    That the landlord cannot make a fair return on investment by retaining the controlled rental unit.

"Notwithstanding the foregoing provisions of this subsection, the Board may approve

*On May 8, 1979*, the Santa Monica City Council passed as an emergency measure, ordinance No. 1124,[4] placing a moratorium on the approval and processing of any application for a tentative map or parcel map for a condominium conversion filed after April 10, 1979, as well as a moratorium on new applications for new condominium conversions.

*On May 25, 1979*, petitioners' escrow closed and the deed was recorded on June 1, 1979.

(Petitioners' allegation that the delay in closing the escrow was due to the sellers' delay over which petitioners had no control is denied by the Board and the City. Petitioners also allege that 26 units had been reserved by prospective buyers by the end of June 1979, a fact which the Board and the City also deny.)

*On June 29, 1979*, the city council adopted another emergency measure, ordinance No. 1127,[5] whose stated purpose was to modify, clarify

---

such a permit:

"(1)  If the Board finds that the controlled rental unit is uninhabitable and is incapable of being made habitable in an economically feasible manner, or

"(2)  If the permit is being sought so that the property may be developed with multifamily dwelling units and the permit application agrees as a condition of approval that the units will not be exempt from the provisions of this Article pursuant to Section 1801(c) and that at least fifteen (15) per cent of the controlled rental units to be built on the site will be at rents affordable by persons of low income."

[4]City of Santa Monica Ordinance No. 1124 provides (in pertinent part): "THE CITY COUNCIL OF THE CITY OF SANTA MONICA ORDAINS AS FOLLOWS:

"SECTION 1.  A moratorium is hereby placed on the approval or processing of any application for approval of a Tentative Tract or Parcel Map for a condominium or community apartment project involving the conversion or removal of controlled rental unit(s) and filed with the City Planning Department after April 10, 1979.

"SECTION 2.  A moratorium is further placed on the acceptance for processing of any new applications for approval of a Tentative Tract or Parcel Map for a condominium or community apartment project involving either the conversion or removal of controlled rental unit(s) and filed with the City Planning Department after the effective date of this ordinance.

"SECTION 3.  A moratorium is further placed on the approval or processing, pursuant to Santa Monica Municipal Code Sections 9122(A) through 9123(F), of any applications for approval of proposed condominium, stock cooperative or community apartment projects involving the conversion or removal of controlled rental unit(s) and filed with the City Planning Department after April 10, 1979, or the acceptance for filing of new such applications after the effective date of this ordinance."

[5]City of Santa Monica Ordinance No. 1127 provides (in pertinent part): "SECTION 4606. VESTED RIGHTS. CONVERSIONS.

"A property owner or subdivider is presumed to have a vested right to convert a controlled rental unit if, prior to April 10, 1979, the tentative tract map was approved and

and implement the rent control charter amendment. In point here, section 4606 of ordinance No. 1127 provided that a property owner is presumed to have a vested right to convert a controlled rental unit if the tentative map was approved prior to April 10, 1979, if the property owner submits evidence of good faith reliance upon the tentative map including the filing of an application for public report with the California Department of Real Estate and the obtaining of necessary building permits and approvals by the Architectural Review Board.

(The City and the Board admit that petitioners' tentative map was approved prior to April 10, 1979, and that the preliminary report had been issued by the California Department of Real Estate, but do deny, on lack of information and belief, petitioners' allegation that no building permits or Architectural Review Board approval was required. As this is presumptively within the City's knowledge, the denial does not appear to be in good faith.)

*On July 2, 1979,* the tentative map was extended by the planning commission of the City on the condition that petitioners obtain a "Certificate of Exemption or a Removal Permit or a Determination of Vested Rights" from the Board prior to approval of the final tract map. The city council upheld the attachment of that condition upon petitioners' appeal to the city council.

*On July 9, 1979,* petitioners requested that the Board find a vested right and the matter was before the Board on July 26, 1979, but was continued with petitioners' consent.

*On July 12, 1979,* the final subdivision map was filed with the City.

(Petitioners allege, and the City denies, that the delay in filing was due to the tardy and deleterious manner in which City processes all paperwork.)

*On July 28, 1979,* the Board amended its proposed rules and regulations and adopted new chapter 6 of its rules and regulations regarding

---

he or she submits satisfactory evidence of good faith reliance; including:

"a)   That application for a public report has been filed with the State Department of Real Estate;

"b)   That necessary building permits and approvals by the Architectural Review Board have been obtained.

"A vested right to proceed under this Chapter shall expire within three (3) years of final map approval as to all units not then sold; such unsold units are thereafter subject in all respects to this Chapter."

claims of vested rights. Under section 6014(b) of chapter 6, the Board in determining claims of vested rights is required to consider if prior to April 10, 1979, the claimant obtained the final governmental approval necessary to remove the rental unit from the housing market, and if the claimant performed, apparently both prior to and after April 10, 1979, substantial work or incurred substantial liability in reliance on final governmental approval. If the claimant cannot satisfy all of the above requirements, no claim of vested rights would be granted.[6]

*On July 30, 1979*, petitioners renewed their request for a vested rights determination in the form mandated by chapter 6 of the Board's rules and regulations.

*On August 2, 1979*, a hearing was held before the Board and the matter was taken under submission.

*On August 8, 1979*, the Board denied petitioners' vested right's determination. The Board commissioners stated orally their findings which were later incorporated into written findings.[7]

---

[6]Section 6014 of chapter 6 of the Board's rules and regulations provides: "(a) Claims of vested rights will be sought by claimants who seek to remove rental units from the residential housing market by demolition, conversion or other means. Subsequent to April 10, 1979, Section 1803(t) of the Santa Monica City Charter requires a permit from the Board in order to remove a controlled rental unit from the residential rental market. Under applicable law, Section 1803(t) cannot be applied to persons who, prior to the adoption of Section 1803(t), obtained a vested right to complete a development that included the removal of an otherwise controlled rental unit from the residential rental market.

"(b) In determining claims of vested rights, the Board will considered [*sic*] the following:

"(1) Prior to April 10, 1979, did the claimant obtain the final governmental approval necessary to remove the controlled rental unit from the housing market. If not, no claim of vested rights can be granted.

"(2).Prior to April 10, 1979, did the claimant perform substantial work or incur substantial liabilities in reliance on the final governmental approval. If not, no claim of vested rights can be granted.

"(3) Did the claimant perform the substantial work or incur the substantial liabilities in good faith reliance on the final governmental approval. If not, no claim of vested rights can be granted."

[7]The written findings of the Board provide: "1. The extension of the tentative subdivision map by the Planning Commission was conditioned upon Rent Board approval. Applicants appealed to the City Council which upheld the condition of the Planning Commission and denied the appeal. These approvals are discretionary approvals occurring after April 10, 1979. The applicants have not secured the last governmental approval prior to April 10, 1979.

"2. The applicants had knowledge that an extension of the tentative was required at the time escrow closed on June 1, 1979 and, therefore knew the final approval had not

PROCEDURAL HISTORY AND POSTURE

Following the Board's denial of petitioners' claim of a vested right, they thereafter unsuccessfully sought relief in the superior court and then filed a petition for extraordinary relief in this court in which they did not seek review of the superior court's denial of relief but rather sought review by an original proceeding in this court. This court denied the petition on the ground that petitioners had not made a showing sufficient to establish that review by way of an original proceeding in this court was justified and that it appeared that petitioners had a remedy by appeal. The Supreme Court granted a petition for hearing and transferred the matter to this court with directions to issue an alternative writ of mandate.[8] The Supreme Court's order of transfer included citation to *Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556].

Intervener Santa Monica Fair Housing Alliance has demurred by way of return. In that demurrer, it is contended that the petition does not state facts sufficient to constitute a cause of action for issuance of the writ in that the facts set forth in the petition support the denial of

---

been obtained.

"3. The purpose of the Rent Control Charter Amendment to preserve rental housing is seriously compromised by the loss of 34 apartment units.

"4. Even if expenditures made and liabilities incurred between the original tentative approval and April 10 are considered, they are insubstantial when the policy of protecting rental housing is considered. A significant number of expenditures and liabilities occur immediately prior to and after April 10, 1979 (approximately $35,000), indicating an accelerated effort to avoid the imposition of the Rent Control Charter Amendment mandates.

"Escrow was opened on October 23, 1978. At that time proponents of rent control had been actively working for several months to qualify another initiative for the April 10 ballot and it was common knowledge that rent control was a possibility in Santa Monica.

"5. The .purchase of the property was not completed until June 1, 1979. The applicants therefore had sufficient notice of the new requirements of the Rent Control Charter Amendment including its principal policy of the preservation of rental housing units prior to the purchase of the property.

"6. Cost of the improvements as documented by the owners and tenants was concentrated in three of the 34 units, constituting a question as to substantial expenditure.

"7. Clearly this rental property was purchased for the specific purpose of conversion to condominiums as a hopefully short-term profitable investment. In consideration of the amounts of expenditures and the dates of the approvals and the intent of the applicants as weighed against the Charter Amendment and its purpose to preserve rental housing, a vested right approval is not substantiated."

[8]There is no dispute herein that petitioners have not exhausted their administrative remedies. Article XVIII, section 1808 of the city charter provides that a landlord aggrieved by any action of the Board may seek judicial review by appealing to the appropriate court with the jurisdiction.

petitioners' vested rights claim by the Board. In view 'of the Supreme Court's action in granting a hearing and transferring the matter to this court with directions that an alternative writ issue and in the absence of, any defects in the pleading of the petition if the allegations be deemed true the demurrer is overruled. (See *Charlton* v. *Superior Court* (1979) 93 Cal.App.3d 858 [156 Cal.Rptr. 107].)

As indicated above, this court originally denied the petition because petitioners had not established that review by original proceeding in this court was justified. The Supreme Court's granting of a hearing and transferring the matter to this court with direction for the issuance of an alternative writ requires that this court treat the present matter as an original proceeding. Accordingly, we do not undertake any review of the superior court proceedings.

All objections based upon a claim that any of the exhibits lodged in this court are not part of the administrative record before the Board are overruled in that no objecting party has furnished this court with a certified record of the proceedings before the Board and in that petitioners have not limited their pleadings to matters contained in the uncertified record furnished by petitioners. All objections to the exhibits on the ground of irrelevancy are overruled on the grounds that the objections either pertain to exhibits containing ordinances of the City or pertain to matters alleged by the objecting parties in the pleadings before this court.

ISSUES

Although the parties frame the controlling issue in terms of whether petitioners had a vested right to a final subdivision map, we construe the determinative issues more precisely to be: whether or not the City can legally impose additional conditions after approval of a tentative subdivision map or after approval of an extension of a tentative map.

DISCUSSION

I

CAN THE CITY APPLY THE RENT CONTROL CHARTER AMENDMENT AFTER APPROVAL OF THE TENTATIVE MAP? NO.

In *Youngblood* v. *Board of Supervisors, supra*, 22 Cal.3d 644, the board of supervisors approved a tentative subdivision map subject to

conditions recommended by the planning commission. The general plan for the county changed between the approval of the tentative map and the final map. The final map was not in conformity with the new general plan and it was contended that the board of supervisors' approval of the final map was improper in that the Subdivision Map Act requires that the subdivision map be in conformity with applicable general and specific plans.

The Supreme Court in *Youngblood* concluded that the board of supervisors acted properly in approving the final map as that result was mandated by former Business and Professions Code section 11549.6.[9]

The Supreme Court explained the reason for its decision in *Youngblood* as follows: "The purpose of section 11549.6, as we perceive it, was to confirm that the date when the tentative map comes before the governing body for approval is the crucial date when that body should decide whether to permit the proposed subdivision. Once the tentative map is approved, the developer often must expend substantial sums to comply with the conditions attached to that approval. These expenditures will result in the construction of improvements consistent with the proposed subdivision, but often inconsistent with alternative uses of the land. Consequently it is only fair to the developer and to the public interest to require the governing body to render its discretionary decision whether and upon what conditions to approve the proposed subdivision when it acts on the tentative map. Approval of the final map thus becomes a ministerial act once the appropriate officials certify that it is in substantial compliance with the previously approved tentative map. (*Great Western Sav. & Loan Assn.* v. *City of Los Angeles, supra*, 31 Cal.App.3d 403, 411, 414; Longtin, Cal. Land Use Regulations, *op. cit. supra*, at p. 600.)" (22 Cal.3d at pp. 655-656.)

Respondents' and intervener's reliance upon cases such as *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546], and *Aries Dev. Co.* v. *California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534 [122 Cal.Rptr. 315], in which the property owners claimed a vested right to an exemption from the California Coastal Zone Conservation

[9]Former Business and Professions Code section 11549.6 was repealed effective March 1, 1975, and replaced by Government Code section 66474.1. Section 66474.1 which contains no substantial change from former section 11549.6 now provides: "[A] legislative body shall not deny approval of a final map pursuant to Section 66474 if it has previously approved a tentative map for the proposed subdivision and if it finds that the final map is in substantial compliance with the previously approved tentative map."

Act is misplaced. ■ The doctrine of vested rights protects property owners from changes in zoning or other land use regulations which occur before the completion of the project. (*Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39 [56 Cal. Rptr. 672, 423 P.2d 824].) The doctrine of vested rights is not based upon interpretation of statute, and it is apparently for this reason that the Supreme Court in *Youngblood* did not mention the doctrine. In *Avco* and *Aries*, the doctrine was in point because nothing in the Subdivision Map Act deals with exemption from requirements imposed by other state statutes. When the question is whether the governing body is prohibited by the provisions of the Subdivision Map Act from adding conditions prior to approval of the final map, the vested rights doctrine is not involved.

The distinctions between the present case and the vested right cases become less obscure when the cases of *Billings* v. *California Coastal Com.* (1980) 103 Cal.App.3d 729 [163 Cal.Rptr. 288], and *Tosh* v. *California Coastal Com.* (1979) 99 Cal.App.3d 388 [160 Cal.Rptr. 170], are considered. In both *Billings* and in *Tosh* the final map was approved but the court in each case held that the California Coastal Commission did not err in denying the property owners' claims of vested right. While the parties did assert that the subdivision map gave them a vested right, there was no issue as to whether the local governmental entity acted improperly in approving the final map. That was, however, the issue in *Youngblood*. In essence it is the issue in the instant case.

■ Nor do we deem it significant that petitioners had not satisfied the conditions imposed upon the tentative map prior to April 10, 1979, the effective date of the Rent Control Charter Amendment. We cannot disregard the provisions of Government Code sections 66473 and 66474 which indicate that a legislative body may not impose additional conditions once the tentative map is approved.

Section 66473 of the Government Code provides (in pertinent part) that "[a] local agency shall disapprove a map for failure to meet or perform any of the requirements or conditions imposed by this division or local ordinance enacted pursuant thereto; provided that a final map shall be disapproved only for failure to meet or perform requirements or conditions which were applicable to the subdivision at the time of approval of the tentative map; and provided further that such disapproval shall be accompanied by a finding identifying the requirements or conditions which have not been met or performed."

In addition section 66474.1 of the Government Code provides that a legislative body shall not deny approval of a final map pursuant to section 66474 if it had approved a tentative map and if it finds that the final map is in substantial compliance with the tentative map. The language in section 66474 of the Government Code which provides that "[a] legislative body of a city...shall deny approval of a final or tentative map" if it makes certain findings is, however, subject to limitations expressed in section 66474.1 as explained by the Supreme Court in *Youngblood* v. *Board of Supervisors, supra*, 22 Cal.3d 644.

The respondents and intervener contend that section 66474.1 does not apply because the planning commission rather than the legislative body (here the city council) approved the tentative map under the rationale of *Save El Toro Assn.* v. *Days* (1977) 74 Cal.App.3d 64 [141 Cal.Rptr. 282]. This contention is without merit.

In *El Toro* the local ordinance provided that the tentative map shall not have any force or effect until approved by the city council. While it is true that in *Youngblood* the board of supervisors (the legislative body) approved the tentative map, the city council here has delegated its authority for approval of tentative maps to the city planning commission. (Gov. Code, § 66474.7; City of Santa Monica Mun. Code, §§ 9303, 9312D, 9314.) There was no such delegation of authority in *El Toro*. Moreover, the situation differs from that before the court in *El Toro* in that no claim is made in the present case that the final map violates state law. It is also significant that the *El Toro* court did not discuss the Subdivision Map Act at all.

Nor is the decision of *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134], in point since the Supreme Court expressly indicated in *Horn* that it was considering whether *tentative* map approval was an adjudicatory function.

The present case is also distinguishable from the case of *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626 [35 Cal.Rptr. 354] (disapproved on another point in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 517 [113 Cal. Rptr. 836, 522 P.2d 12]). In *Kappadahl*, long after the final map had been approved, a zoning change was made. The court in *Kappadahl* rejected the contention that the final map is binding as to future zoning changes. As indicated in *Kappadahl*, the approval of a final map does not bind the police power of the city. The City here, however, is acting

contrary to the provisions of the Subdivision Map Act and *Kappadahl* is not authority for the proposition that a local agency can resort to the police power to circumvent the express provisions of the Subdivision Map Act.

The same factor distinguishes the building permit cases. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra*, 17 Cal.3d 785.) If the City were asked to issue a building permit, the issues in this case would be different. However, here the building is completed and no building permit is needed. Rather the City has attempted to impose an additional condition after approval of the conditional tentative map.

Accordingly, our conclusion is extremely narrow in scope. We hold only that the City could not impose additional conditions after the conditional approval of the tentative map. Nothing herein should be construed as a determination that the approval of a tentative map would allow a property owner to proceed without obtaining other permits which the City might impose if it were not relying upon the Subdivision Map Act. (See *Oceanic California, Inc.* v. *North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57 [133 Cal.Rptr. 664].)

II

CAN THE CITY REQUIRE THAT PETITIONERS COMPLY WITH THE RENT CONTROL CHARTER AMENDMENT BECAUSE PETITIONERS SOUGHT AND RECEIVED ON JULY 2, 1979, AN EXTENSION OF THE TENTATIVE MAP? NO.

Subdivision (a) of section 66452.6 of the Government Code provides that "[a]n approved or conditionally approved tentative map shall expire 12 months after its approval or conditional approval, or after such additional period of time as may be prescribed by local ordinance, not to exceed an additional 18 months."

Former subdivision (c) of section 66452.6 of the Government Code[10] provided that "[u]pon application of the subdivider filed prior to the ex-

---

[10]Section 66452.6 'was amended effective July 25, 1979. (Stats. 1979, ch. 297, § 1.) As that amendment altered former subdivision (c) only by changing the subdivision letter (c) to (e), we need not consider if the 1979 amendment to section 66452.6 is applicable to the present case.

piration of the approved or conditionally approved tentative map, the time at which such map expires may be extended by the legislative body or by an advisory agency authorized to approve or conditionally approve tentative maps for a period or periods not exceeding a total of two years. If the advisory agency denied a subdivider's application for extension, the subdivider may appeal to the legislative body within 15 days after the advisory agency has denied the extension."

Respondents and intervener correctly argue that extension of a tentative map under former subdivision (c) of section 66452.6 is discretionary. In *Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720 [125 Cal.Rptr. 896, 543 P.2d 264], the Supreme Court considered and rejected a contention that a use permit would be extended by the legislative body as a matter of course. The use of the word "may" in section 66452.6 of the Government Code also supports the proposition that extension is discretionary. However, section 66452.6 expressly permits an extension only as to "time." There is no provision which suggests that the legislative body or advisory body is to reconsider its findings under section 66474 when granting an extension of time and indeed, the requirements for notice upon approval of a tentative map (see *Horn* v. *County of Ventura, supra*, 24 Cal.3d 605) would make such a result unworkable.

Respondents and intervener cite no authority which supports a different interpretation of section 66452.6. The cited case of *Strong* v. *County of Santa Cruz, supra*, 15 Cal.3d 720, involved the failure to renew a use permit which specifically provided that it would be subject to a new ordinance upon expiration. The Supreme Court in *Strong* was of the opinion that the board of supervisors would not routinely approve an extension in view of the express limitation on the permit. Although the Supreme Court states that the county would have considered the extension in view of a pending ordinance, the court nowhere indicates that the extension could be granted conditionally.

Moreover, intervener's reliance upon the Attorney General's opinion (56 Ops.Cal.Atty.Gen. 274 (1973)) which determines that the city may impose conditions upon tentative maps not contained in the Subdivision Map Act is misplaced. The Attorney General was clearly considering only the imposition of conditions upon tentative maps and was not at all concerned with the granting of an extension of time under section 66452.6 of the Government Code.

## III

In view of our conclusion that petitioners may proceed to obtain final map approval without regard to the additional condition imposed in the extension, we deem it unnecessary to discuss the myriad other contentions raised by the parties.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondents to set aside the August 8, 1979, decision of the Permanent Rent Control Board of the City of Santa Monica denying petitioners' request for a vested right determination and thereafter enter a new and different decision finding that petitioners are entitled to consideration of approval of the final map without regard to the provisions of the Rent Control Charter Amendment and any ordinances or rules enacted pursuant to said amendment.

Lillie, Acting P. J., and Newman (J. M.), J.,* concurred.

Petitions for a rehearing were denied November 4, 1980, and the opinion was modified to read as printed above. The petitions of respondent Permanent Rent Control Board and intervener for a hearing by the Supreme Court were denied December 17, 1980. Bird, C. J., was of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.