[Civ. No. 61773. Second Dist., Div. Four. Jan. 19, 1982.]

HAZON-INY DEVELOPMENT, INC., Plaintiff and Appellant, v.
CITY OF SANTA MONICA et al., Defendants and Respondents.

[Civ. No. 61777. Second Dist., Div. Four. Jan. 19, 1982.]

A.A.V., Plaintiff and Appellant, v.
CITY OF SANTA MONICA et al., Defendants and Respondents.

[Civ. No. 61787. Second Dist., Div. Four. Jan. 19, 1982.]

828 ARIZONA STREET PROPERTIES, Plaintiff and Appellant, v.
CITY OF SANTA MONICA et al., Defendants and Respondents.

[Civ. No. 61790. Second Dist., Div. Four. Jan. 19, 1982.]

NATALE URBANO et al., Plaintiffs and Appellants, v.
CITY OF SANTA MONICA et al., Defendants and Respondents.

**COUNSEL**

William A. Ross and Steve I. Kaplan for Plaintiffs and Appellants.

Robert M. Myers, City Attorney, Stephen Shane Stark, Assistant City Attorney, Michael Heumann and Joel Martin Levy for Defendants and Respondents.

**OPINION**

**WEIL, J.*—Petitioner Hazon-Iny Development, Inc. (hereinafter Hazon) appeals from a judgment denying its petition for a writ of mandate**

*Assigned by the Chairperson of the Judicial Council.

commanding respondents City of Santa Monica, its mayor and city councilmen (all of whom are collectively hereinafter sometimes referred to as City) and respondent William Rome, the chief building officer (hereinafter Rome), to reinstate a building permit previously issued to Hazon or to issue a new building permit or, in lieu of doing either, to approve a final subdivision map submitted by Hazon without the necessity of Hazon fulfilling one of the conditions of tentative tract map approval that the dwelling units in the building be reduced in number from 14 to 10. Petitioners A.A.V. (hereinafter AAV), 828 Arizona Street Properties (hereinafter 828), and Natale and Juliette Urbano (hereinafter Urbanos) appeal from similar judgments denying their requested writs of mandate that would have compelled respondents to either issue building permits to them or, in lieu thereof, approve their respective final subdivision maps without the necessity of any of them complying with the tentative subdivision map approval condition that the number of dwelling units in each of their respective apartment buildings be reduced. Because common questions of law are involved in each appeal, the four separate appeals have been consolidated.

PROCEDURAL AND FACTUAL BACKGROUND

On June 5, 1978, the planning commission of City approved a tentative subdivision map submitted by petitioner 828 for the condominium conversion of an 11-unit apartment building. The approval was conditioned upon, among other things, the reduction in the number of dwelling units from 11 to 9 together with various other conditions. Similar tentative tract map approvals containing similar conditions reducing the number of dwelling units in their apartment buildings that were being converted to condominiums were obtained by the Urbanos on February 5, 1979, by AAV on March 5, 1979, and by Hazon on March 19, 1979.

On April 9, 1979, City issued a building permit to Hazon to authorize the construction incident to reducing the number of units in its building. The next day, April 10, 1979, the Santa Monica City electorate adopted chapter XVIII to the Santa Monica City Charter known as the "Rent Control Charter Amendment" (hereinafter RCCA) which prohibits removal of controlled rental units by demolition, conversion or other means without obtaining approval of such removal from the Santa Monica Rent Control Board (hereinafter RCB).[1]

---

[1]The applicable provisions of said amendment include the following: "Section 1801. Definitions. . . .

Thereafter, City enacted ordinance No. 1127 (CCS) on June 29, 1979, for the purpose of codifying, clarifying and implementing the rent control initiative into the new rent control law. Said rent control law contains provisions under which persons seeking vested right exemptions may apply for such through the new RCB.[2]

---

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(c) CONTROLLED RENTAL UNITS: All residential rental units in the City of Santa Monica, . . . except:

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(5) Rental units and dwellings constructed after the adoption of this article; this exemption does not apply to units created as a result of conversion as opposed to new construction.'"

"Section 1803 Permanent Rent Control Board:

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(t) REMOVAL OF CONTROLLED RENTAL UNIT FROM RENTAL HOUSING MARKET: Any landlord who desires to remove a controlled rental unit from the rental housing market by demolition, conversion or other means is required to obtain a permit from the Board prior to such removal from the rental housing market in accordance with rules and regulations promulgated by the Board. In order to approve such a permit, the Board is required to make each of the following findings:

"(1) That the controlled rental unit is not occupied by a person or family of very low income, low income or moderate income.

"(2) That the rent of the controlled rental unit is not at a level affordable by a person or family of very low income, low income, or moderate income.

"(3) That the removal of the controlled rental unit will not adversely affect the supply of housing in the City of Santa Monica.

"(4) That the landlord cannot make a fair return on investment by retaining the controlled rental unit.

"Notwithstanding the foregoing provisions of this subsection, the Board may approve such a permit:

"(1) If the Board finds that the controlled rental unit is uninhabitable and is incapable of being made habitable in an economically feasible manner, or

"(2) If the permit is being sought so that the property may be developed with multifamily dwelling units and the permit applicant agrees as a condition of approval that the units will not be exempt from the provisions of this Article pursuant to Section 1801(c) and that at least fifteen (15) per cent of the controlled rental units to be built on the site will be at rents affordable by persons of low income."

[2]The applicable portion of the rent control law is as follows:

"SECTION 4604. VESTED RIGHTS. EFFECTIVE DATE. The date of April 10, 1979, shall be used as a reference point for calculating vested rights claims arising under this Chapter.

"SECTION 4605. VESTED RIGHTS. BASIC TEST. In order to have secured a vested right to do or not to do a certain thing notwithstanding the provisions of this Chapter, unless provided otherwise in Section 4607, a person must have secured the last governmental approval necessary to the performance of the desired thing, and, in good faith reliance on that approval, must have performed substantial work or incurred substantial liabilities in furtherance thereof. No right shall vest under this Chapter unless all conditions precedent to obtaining all necessary governmental approvals have been satisfied as determined by the Interim Rent Control Board and Permanent Rent Control Board.

"SECTION 4606. VESTED RIGHTS. CONVERSIONS. A property owner or subdivider is presumed to have a vested right to convert a controlled rental unit if, prior to April

Thereafter on July 2, 1979, respondent City issued a "stop notice" for work being done under the building permit previously issued to Hazon. The permit subsequently expired. According to the declaration of respondent Rome filed in this and other proceedings, it is the present policy of respondent City "that no new building permits for the purpose of combining units as part of a condominium conversion will be issued unless the Rent Control Board has given its approval, either through a removal permit issued under section 1803(t) of the Rent Control Act, or through a vested rights determination made pursuant to chapter 6 of the Board's rules and regulations."

Appellant Hazon filed a claim for vested right determination with the RCB that was denied on July 19, 1979. Judicial review of that determination has never been sought. Petitioner Hazon made demand on respondent City to reinstate its building permit on January 2, 1980; said demand was denied and petitioner Hazon filed suit January 11, 1980. Hazon's tentative tract map expired March 18, 1980.

None of the other three appellants ever obtained the building permits that were necessary to reduce the number of units in their respective apartment buildings.

The Urbanos applied to have their final subdivision map placed on respondent City council's agenda for approval; such request was denied on November 14, 1979, and they were told to first obtain a removal permit from the RCB. RCB denied their vested right claim on January 8, 1980, and no judicial review was sought of such denial. Respondent Rome denied an application for a building permit on January 22, 1980, for lack of RCB approval. On February 4, 1980, the City planning commission denied the Urbanos' request for an extension of their tentative tract map which expired on February 5, 1980. On the same day the Urbanos filed their petition for writ of mandate.

Petitioner 828's application for a one-year extension of its tentative tract map was approved on May 21, 1979, with the added condition

10, 1979, the tentative tract map was approved and he or she submits satisfactory evidence of good faith reliance; including:

"a) That application for a public report has been filed with the State Department of Real Estate;

"b) That necessary building permits and approvals by the Architectural Review Board have been obtained.

"A vested right to proceed under this Chapter shall expire within three (3) years of final map approval as to all units not then sold; such unsold units are thereafter subject in all respects to this Chapter."

that it obtain RCB approval prior to filing its final tract map or else have established a legally recognized vested right. Thereafter its application for a building permit was denied on November 28, 1979, for lack of prior RCB approval. Thereafter 828 filed an application for vested right determination with the RCB but withdrew the application on January 10, 1980, the day that it was scheduled to be heard. Its petition was filed February 14, 1980; its tentative tract map expired May 20, 1980.

Appellant AAV applied for a building permit June 4, 1979. Respondent Rome denied said application on February 29, 1980, for lack of RCB approval. The record before us does not disclose whether appellant AAV ever applied to the RCB for either a removal permit or a vested rights determination. Said appellant filed its petition on February 4, 1980, the day its tentative tract map expired. AAV submitted to the trial court a declaration indicating that it had expended $35,000 in replacing, repairing or upgrading various components of the subject premises "in anticipation of the approval of the condominium conversion application concerning the subject property and pursuant to the conditions of approval of tentative tract 36459, . . ." The trial court found that petitioners had expended said monies for cosmetic and minor repairs and painting of the existing building and swimming pool in anticipation of receiving and in reliance on tentative tract map approval, but that petitioners did not incur the major expense of reducing the number of existing units by almost one-third from 22 to 16, which reduction was required to fulfill the conditions imposed on the tentative tract map.

## ISSUE ON APPEAL

When a landowner holding a tentative tract map conditioned on reducing the number of dwelling units in a proposed condominium conversion is required by subsequently enacted legislation to obtain a permit from a newly created rent control board authorizing the removal of a controlled rental unit, is such requirement an impermissible impairment of the subdivision process? For the reasons hereinafter stated, we conclude it is not.

## DISCUSSION

Appellants' principal contention is that local government may not enforce subsequently enacted legislation to the possible detriment of a developer who is already the possessor of a tentative tract map.

Appellants rely on *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556], and *El Patio* v. *Permanent Rent Control Bd.* (1980) 110 Cal.App.3d 915 [168 Cal.Rptr. 276], for the proposition that the application of the subsequently enacted removal permit requirement to their projects constitutes the improper addition of a condition of approval to their respective final maps, which condition did not exist when their tentative maps were approved prior to adoption of the charter amendment.

In *Youngblood* the San Diego County Board of Supervisors approved a tentative subdivision map for one acre residential lots. Shortly thereafter, the board revised the land use element of the county general plan requiring two acre minimum lot sizes for the property in question. The Supreme Court in *Youngblood* held that the board acted properly in approving the final map of one acre lots on the grounds that the final map was required only to conform to the general plan in effect when the tentative map was approved. The court's reasoning was explained as follows: "The purpose of [Bus. & Prof. Code] section 11549.6, as we perceive it, was to confirm that the date when the tentative map comes before the governing body for approval is the crucial date when that body should decide whether to permit the proposed subdivision. Once the tentative map is approved, the developer often must expend substantial sums to comply with the conditions attached to that approval. These expenditures will result in the construction of improvements consistent with the proposed subdivision, but often inconsistent with alternative uses of the land. *Consequently it is only fair to the developer and to the public interest to require the governing body to render its discretionary decision whether and upon what conditions to approve the proposed subdivision when it acts on the tentative map. Approval of the final map thus becomes a ministerial act once the appropriate officials certify that it is in substantial compliance with the previously approved tentative map.* (Italics added.) (*Great Western Sav. & Loan Assn.* v. *City of Los Angeles, supra*, 31 Cal.App.3d 403, 411 . . . .)" (22 Cal.3d at pp. 655-656.)

In *El Patio* the developer had obtained a tentative tract map before the rent control act was enacted. Thereafter, when the developer sought an extension of the tentative tract map which would otherwise have expired, the City granted such extension conditioned upon the landowner obtaining a "certificate of exemption or a removal permit or a determination of vested rights" from the RCB prior to approval of the final tract map. In the course of its opinion, the *El Patio* court said: "We

cannot disregard the provisions of Government Code sections 66473 and 66474 which indicate that a legislative body may not impose additional conditions once the tentative map is approved." (*El Patio* at p. 925.)

Both cases are distinguishable from the facts before us. While it is true that the removal permit requirement did not exist when the tentative maps were approved, it is also true that the conditions of the tentative maps required reduction in the number of units. These reductions necessitated building permits, and were, therefore, subject to the requirement under general law and Building Code section 303(a) that appellants comply with laws in effect at the time of issuance of the building permit.

The *El Patio* decision was a narrow one which expressly recognized the viability of police power-based regulations. *El Patio* merely follows *Youngblood* in holding that the City had to approve a final map where the property owner had complied with the conditions originally attached to the tentative map, which did not include rent control approval. (110 Cal.App.3d at p. 927.)

The *El Patio* court clearly did not address the question of whether or not the developer there could actually proceed with the intended project. The court had before it a case involving an intended conversion to condominiums of an existing structure. No building permit was needed. The owner had sought a vested right determination from the board, but had failed because, inter alia, the City had refused to approve a final map, after having added rent control approval as a condition of an extension of the time limit on the tentative map.

The court was very careful to distinguish those cases upholding police power regulation in spite of tract map approvals, and to make clear the narrow scope of its decision.

The *El Patio* opinion differentiates the case of *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626 [35 Cal.Rptr. 354], which holds that final subdivision map approval does not bind the police powers of the city with respect to future zoning changes. As to *Kappadahl*, the *El Patio* court stated: "In *Kappadahl*, long after the final map had been approved, a zoning change was made. The Court in *Kappadahl* rejected the contention that the final map is binding as to future zoning changes. As indicated in *Kappadahl*, the approval of a final map does not bind

the police power of the City. The City here, however, is acting contrary to the provisions of the Subdivision Map Act and *Kappadahl* is not authority for the proposition that a local agency can resort to the police power to circumvent the express provisions of the Subdivision Map Act." (*Id.*, 110 Cal.App.3d at pp. 926-927.)

The *El Patio* court next discusses *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1977) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546], which holds that a developer must comply with the laws in effect at the time a building permit is to be issued, even laws which have been enacted after application for the permit. In distinguishing *Avco*, the *El Patio* court said: "The same factor distinguishes the building permit cases [citation]. *If the City were asked to issue a building permit, the issues in this case would be different. However, here the building is completed and no building permit is needed.* Rather the City has attempted to impose an additional condition after approval of the conditional tentative map. (Italics added.) (*Id.*, 110 Cal.App.3d at p. 927.)

The court followed with this conclusion: "Accordingly, our conclusion is extremely narrow in scope. We hold only that the City could not impose additional conditions after the conditional approval of the tentative map. *Nothing herein should be construed as a determination that the approval of a tentative map would allow a property owner to proceed without obtaining other permits which the City might impose if it were not relying upon the Subdivision Map Act* (See *Oceanic California, Inc.* v. *North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57 . . . .)" (Italics added.) (*Ibid.*)

In effect the *El Patio* court stated that had a building permit been necessary under the circumstances of that case, *Avco* would have controlled and the requirement of the building permit would have been independently enforceable. Unlike the situation in *El Patio* where the city could only rely upon the extension sought for the tentative tract map under the map act as a peg for adding the condition that the developer comply with the new rent control law, here we are dealing with building permits and removal permits which have independent reasons for existence and which are applicable to all persons seeking to reduce the number of units in their buildings whether they be subdividers holding tentative tract maps or landlords seeking to increase the size of their dwelling units by reducing their number.

The *Avco* court rejects the concept that the issuance of a building permit is a purely ministerial nondiscretionary act in the following terms (p. 795): "The contention that Avco was entitled to a building permit because the county would have been compelled to issue it upon mere application has no merit. The Orange County Building Code (§ 302(a)) provides that a building permit may not issue unless the plans conform not only to the structural requirements of the code but to 'other pertinent laws and ordinances.' This provision codifies the general rule that a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. (*Brougher* v. *Board of Public Works* (1928) 205 Cal. 426, 435 [271 P. 487]; see *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824]; cf. *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; and see cases collected in 50 A.L.R.3d 596, 602.) A landowner which has not even applied for a permit cannot be in a better position merely because it had previously received permission to subdivide its property and made certain improvements on the land.[6]"

Footnote 6 of the Avco case reads as follows: "6. In *Aries Dev. Co.* v. *California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534 [122 Cal.Rptr. 315], the court applied the 'final discretionary approval' test in determining that a landowner had not acquired vested rights to develop its property. The commission had contended in the trial court and in its opening brief on appeal that a vested right could arise without a building permit if the government had approved a specific project and 'all final discretionary approvals' had been obtained. The court believed itself bound to decide the case on this theory because of the position the commission had adopted below and in its opening brief on appeal."

Following *Avco, supra*, 17 Cal.3d 785 which holds that a developer must comply with existing laws at the time he seeks his building permit, it can then be argued that the tentative maps require as one of their conditions that appellants comply with all applicable laws, including those subsequently enacted, which were pertinent to their particular projects. In that sense, the removal permit requirement was not an "additional" condition but rather one which conceptually was included in the original conditions of the tentative map.

Appellants AAV and 828 argue that the City acted improperly as to them by granting their respective tentative tract map extensions condi-

tioned upon their compliance with the subsequently enacted RCL. Though such position is correct, it does not detract from the fact that neither appellant obtained the requisite building permits that were ·proper conditions of their respective tentative tract maps.

In Hazon's case, additional support for the trial court's ruling is found in Hazon's failure to exhaust administrative remedies by not taking permitted appeals to City's building department from a revocation of its building permit. (2 Cal.Jur.3d, Administrative Law, § 262 (and cases cited at p. 507 n. 86).)

As to AAV, the record before us does not disclose that such petitioner sought a vested rights determination from the RCB. In the absence of such an application and denial, the trial court could not have properly considered appellant's petition as one for administrative mandamus because there was no administrative decision to review. Therefore, since AAV failed to exhaust its administrative remedies, the amount of its expenditures was irrelevant to the proceedings in the trial court.

Thus we conclude that appellants did not demonstrate the existence of a mandatory and ministerial duty on the part of City to issue the building permits (or, in the case of appellant Hazon, to reinstate said permit), and that all petitions for writ of mandamus were properly denied.

The judgments are affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied February 11, 1982, and the petition of appellants in Nos. 61773, 61787 and 61790 for a hearing by the Supreme Court was denied April 22, 1982.